I guess we won't hear from Ms. Howells first, is that right? I apologize, Chief Judge. I am not Ms. Howells. My name is Zach Ewing. I'm with Kirkland and Ellis, and I first want to thank the court for its appointment as pro bono counsel in this case. I do want to introduce the student attorneys who will be presenting oral argument. Ms. Howells will be presenting argument on the motion to dismiss that was converted to a motion for summary judgment relating to the doctor appellants, defendants, and Ms. Badillo-Garcia will be presenting argument related to the St. Tammany defendant appellant who had a motion to dismiss that was granted. The appellant's intent is to present arguments simultaneously, one after another, but we defer to the court if the court would rather hear argument on one issue and then hear from the appellees. They can go one right after the other. Thank you, Your Honor. We did that yesterday with other attorneys. Fantastic. We defer to the court. Thank you very much.  Good morning, Your Honors. May it please the court. Again, my name is Gabrielle Howells, and I will be presenting the issues concerning the doctor defendants today, and I respectfully reserve two minutes for rebuttal. This case presents a dramatic break from this court's longstanding precedent and mandate that pro se litigants be given a fair opportunity to develop and present their case despite inartful pleading or imperfect navigation of oftentimes complex court procedures. It's a case where the magistrate judge sua sponte converted a motion to dismiss into a summary judgment motion, thereby raising the required showing to avoid dismissal, and then cut off discovery by affirming his own report and recommendation before the pro se litigant was given a fair opportunity to discover information essential to that converted motion. And yet, despite all that, the limited record that is available, including the defendant's own . . . You mean affirming his own . . . What do you mean by that? I'm confused. Just that the magistrate judge, he cut off discovery when he reaffirmed his own report and recommendation. What does that mean, reaffirmed his own report? That's the part I don't understand. I could just clarify. He just . . . he cut off discovery when he affirmed his report and recommendation on consent of the parties. But he doesn't affirm his . . . On consent of the parties. You mean the parties consented after he had written the report? That's correct, yes. Okay. Because that was . . . I have a question related to the standard review. We review grants of summary judgment de novo, but here we have a report and recommendation from a magistrate judge that does not appear to have been objected to and was not reviewed by a district court because there was consent, and was converted to a dismissal. So are we under plain error review? Your friend on the other side seems to think we're under plain error review. Yes, it appears that we're under plain error review, but there is a potential argument that it could be de novo regardless, which I will get to soon. Okay. But just to . . . Could you get to that now? Yes. Yes. I want to make sure, are you agreeing that there was consent for a magistrate to make these determinations? Yes. The parties consented to present before the magistrate judge. I can get into the potential counter-argument to the . . . What is the standard review that you believe is most appropriate here? That's a very important question for us. I believe the most appropriate standard of review here is de novo, though I can recognize why the defendants argue . . . Why do you believe de novo is legally appropriate? Like we mentioned, the magistrate judge issued a report and recommendation, and objections to that report were due by April 14th. And Mr. James did file a second motion to compel, and at the end of that second motion to compel, he did ask the magistrate judge to deny their motion to dismiss because they had not yet complied with their discovery obligations. So one of our arguments is that the magistrate judge could have treated that as a timely objection to the report and recommendation, but instead just did not. So that could provide a possible avenue through which to review this case de novo as opposed to plain error. But just getting back into after those procedural irregularities where the court converted and then cut off discovery, despite all of that, the limited record that is available still includes or is rife with disputed fact issues that should have precluded summary judgment in the lower court regardless. So in light of these procedural irregularities and these fact disputes, we respectfully ask this court to reverse and remand for discovery and proper adjudication on the merits. So just starting with the procedural irregularities, reversal is warranted here because the pro se litigant was prematurely shut out of the courts after being deprived of the protections that this court requires be given to pro se litigants. I do think that it's probably wise to give a little bit of a timeline of the underlying proceedings just for clarity purposes. So Mr. James, he did file his complaint on September 12th, and the doctor defendants, they filed their motion to dismiss on November 23rd, and that was their first and only filing in the underlying proceedings. Mr. James filed a motion to compel exactly a month later on December 23rd, and that was denied a little over a month later on January 26th as premature. And then a... The motion to compel was denied as premature. The first one was, yes. He filed three total, yes. So a few days after that first motion to compel was denied as premature, the magistrate converted that motion to dismiss into the summary judgment motion. And then on February... Why did he compel as premature? Because he had not... Sorry to interrupt, but he had not yet first served discovery requests on the parties. He was just unseasoned and... Did it say serve discovery requests? But at that point, it becomes obvious that there's a desire for discovery, though. Correct, yes. But yes, the magistrate judge did specifically state that it was premature because he hadn't first shown that he propounded discovery requests on the opposing parties. So that first motion to compel was denied as premature. And then, again, the motion was converted on February 1st. And then by February 22nd, Mr. James served proper discovery requests on both parties. And those responses were due by March 22nd. That deadline came and went. And just... Did the court know that the discovery had been served? Not... At the time that it was thinking about ruling on the summary judgment, and did your client in any way say, please hold off on the summary judgment because I need discovery? And remember, I told you I needed discovery last month or whatever. Yes, yes. So he told the magistrate judge on at least three separate occasions that discovery was still outstanding. He did it in that second motion to compel, as I said, where he asked if the magistrate judge would deny those motions because they had not fulfilled their discovery obligations. He also did so in his opposition motion that he filed after receiving discovery from the jailer defendants. He let the magistrate judge know that he would be filing a third motion to compel because neither defendant had yet, or sorry, the doctor defendants had not yet complied with their discovery obligations. So... But what about a response to the summary judgment? Can you clarify what you mean? What about, what response did he file specifically to the summary judgment? So that would be his opposition. He filed one consolidated motion in opposition to both sets of defendants' respective motions to dismiss. And it's just kind of clear from his pleadings that I don't think he understood what exactly summary judgment was or that there was a distinction between summary judgment and in the original motion to dismiss. So it's clear from the text of his opposition motion that it was directed at both sets of defendants. What was the, what facts or evidence was the court relying upon that necessitated a conversion to summary judgment at that point? The doctor defendants and the jailer defendants attached Mr. James' medical records to their motions to dismiss and the magistrate judge, at least to the doctor defendants' motion, figured that it would be helpful in resolving the claim. So he went ahead and converted the motion on that basis. So just jumping back in, so again, there were at least three separate occasions where Mr. James put the magistrate judge on notice. One of that was within the time allowed for an objection to the report and recommendation. And another time was at least a month before the magistrate judge entered the dismissal order. So there was still time for the magistrate judge to reign the doctor defendants in or at least sanction them or put them on notice that they needed to comply with their discovery obligations. But the magistrate judge instead just completely disregarded his many pleas for help. He also completely disregarded James' opposition motion and he abandoned James' third motion to compel and just kind of inexplicably reaffirmed his report and recommendation. Just to clarify, is your client pursuing claims against only the doctor defendants and Deputy Hines at this point? He is, in fact, pursuing claims against the doctor defendants. As for the jailer defendants, he is definitely pursuing a claim against Deputy Hines. As for the remaining defendants on that side, he is hoping to get an opportunity to amend as a pro se plaintiff to be able to come up with any claims that may be proper or may exist as to the others. But as of right now, we can concede that on the record there are no, I guess, actionable claims against the other. No live claims against any other deputies other than Deputy Hines? That's correct. Yeah. As to the jailer defendants, yes. So just as this court recognized in Morrell, although Mr. James' requests or his documents or filings may have been inartful, the thrust of his requests were very clear. He wanted the chance to show that material disputes existed and the magistrate judge, especially given his pro se status, should have done more before entering summary judgment. In Morrell, this court offered several examples of things that the court could have done, including appointing counsel to help him with discovery, or perhaps he could have treated his second motion to compel as a timely objection to the report and recommendation. He could have treated any number of his filings, putting the magistrate on notice that discovery was still outstanding as a Rule 56E motion for continuance pending discovery, or he just could have denied summary judgment and held an evidentiary hearing instead. What is your best case to support the delay in Mr. James' medical treatment amounted to by the doctors and Deputy Hines? The best case? They kind of . . . it's kind of like element by element. There is a case from the Tenth Circuit that is exactly on point as far as the exact claim that's given, but as for just the best case, there's not one best case in particular. You need to pick your . . . I'm asking you, what would you have us rely upon? That's a question we often ask. What would you have us rely upon that would say that you would win, that the delay in the timing of the treatment is enough to constitute deliberate indifference rather than just . . . We have a lot of cases about people, and many of them who are incarcerated, where delays in treatment are considered medical negligence, not deliberate indifference, and medical negligence is not actionable. Right. Can you help us? What case is most similar to this one that would allow your client to overcome summary judgment? Yes. So, there is a case, Gobert, and in that case, there was a plaintiff who was also an inmate, if I can recall correctly, and he similarly had an open wound that was very visibly pus ridden and inflamed and swollen, and we have the exact same case here. Mr. James had an eye infection. It was an open wound. It was very clear, pus ridden, swelling, inflammation, so it was the exact same factual circumstances there as occurred here, but it is a little bit of a different kind of claim because, as you guys probably know from the briefing in this court, Mr. James's claim for deliberate indifference as to the doctor defendants is based on the idea that they delayed his treatment by falsifying his medical records to cover up their initial delay, and because of that, his treatment was delayed even further, but unlike other cases that have come before this court regarding the falsification of medical records, Mr. James's allegations were not conclusory. He offered evidence. He also offered several improper motives by which to infer that the erroneous entries were indeed purposeful falsifications as opposed to unintentional oversights. Would you be dealing with Deputy Hines, or is your colleague going to deal with Deputy  Hines? She will be dealing with Deputy Hines, yes, but I can absolutely speak to the doctor defendants. There's really three main categories of documents that Mr. James offered to support the idea that the doctor defendants falsified his medical records or at bottom to create fact disputes, so we have the internal grievance documents, the refusal itself, the medical refusal itself, and then the sheriff's review decision, so beginning with the grievance documents, well, I'll just give like a short kind of timeline just for clarity purposes. His treatment was originally ordered on June 1st, and he was able to incidentally receive treatment on the 2nd of June when he went to medical for lab work, but his first scheduled appointment was due for June 7th. Of course, Deputy Hines did not take him to that first scheduled appointment. He filed a grievance on June 20th, and that grievance was forwarded to Dr. Ham first, so Dr. Ham was the first person that dealt with that grievance, and the warden was the second person that dealt with that grievance, and in neither of those first two responses from Dr. Ham or the warden was that medical refusal form mentioned. It was not mentioned at all. What those two responses said was you received your treatment as you were supposed to, and that's kind of the end of it. It wasn't until the sheriff's review at the very end sometime in August, I believe, that the medical refusal form was mentioned for the first time to support the idea that you didn't receive your treatment because we had a medical refusal form in your file that was submitted by Deputy Hines. So again, just getting back to that evidence that at least creates a fact dispute regarding these falsifications, starting with those internal grievance documents, those first two steps. The fact that the refusal was not mentioned in those first two steps raises a fact dispute about when the refusal was actually prepared, or at least filed in his medical records, because it's kind of inexplicable why that refusal would not be mentioned in those first two steps of the grievance process, but it was inexplicably mentioned for the first time in the file. And to be clear, my understanding is Mr. James says he never signed a medical... That's correct. Yes. Yeah. And then those internal grievance documents also raise a fact dispute as to whether that refusal is truly to blame for the reason why his care was delayed for so long, which was represented to James by Dr. Hamm and Nurse McKnight in his first appointment after the delay in his care. And then the actual refusal form itself, again, James did not sign that. Instead, Nurse McKnight's signature is in the inmate signature line, and that in turn raises a fact dispute regarding whether Nurse McKnight retroactively signed that form after that July 19th appointment, the first appointment he had following the delay, because... Thank you. Your time is expired, and you've saved time for rebuttal. We appreciate your arguments here today. The only thing I would say regarding your arguments is you might want to not say you guys to the court, but appreciate your very thorough explanation, and we look forward to your rebuttal. Thank you. Thank you. Thank you so much, ma'am. We'll hear now from Ms. Bedillo-Garcia. Madam Chief Judge, and may it please the Court, my name is Lizeth Bedillo-Garcia, and I, together with my co-counsel, represent the plaintiff appellant, Mr. Stephan Eric James. I will be speaking on the issues relating to the prison defendants for 10 minutes, and I respectfully reserve two minutes for rebuttal. At its core, this case asks whether a pro se inmate states a plausible Eighth Amendment claim when he alleges a serious diagnosed medical condition, a physician-ordered treatment plan, and a weeks-long delay in receiving that treatment, resulting in unnecessary pain and deterioration. The answer, under clearly established law, is that he does. This Court should reverse the District Court's dismissal of Mr. James' claims against the St. Tammany defendants with prejudice for two reasons. First, Mr. James' pleadings allege precisely the kind of deliberate indifference that this Court has recognized as sufficient at the pleading stage under binding precedents such as Alderson v. Concordia Parish and Carlucci v. Chapa. Second, even if Mr. James' original pro se complaint fails as to some of the defendants, the District Court erred in denying Mr. James the opportunity to amend before dismissing his claims with prejudice, especially given the liberal amendment standards that apply to pro se plaintiffs in this circuit. Would it be futile to allow amendment here? Your Honor, there is an exception to the amendment rule, including futility, but that is only applicable if it can be said that a plaintiff has pled their best case. That's what I'm asking you. Has the plaintiff pled his best case, or could he plead case claims that would survive against these other deputies? Your Honor, as to the three remaining defendants and not Deputy Hines, we concede that there are no facts that we are aware of that could state a claim against them absent further development through discovery and amendment, which we argue that the District Court erred in failing to provide him. But right now, as you stand here today, you're not aware of claims that could be made out? As to Sheriff Smith, Assistant Warden Simmons, or Warden Fleischman, yes, Your Honor. Based on his inartfully pleaded pro se complaint, there are no allegations presently. But, I mean, that you could make, that you're not aware of any that you would make in a properly filed complaint today? If we were allowed to amend, we would seek to discover evidence that Mr. James himself sought from the prison defendants, including records, video transcripts, and as to Deputy Hines, we would request logs as to the medical transport on the days during the period at issue. But he was not given that opportunity, Your Honor. As to Deputy Hines, your briefing doesn't really discuss the subjective intent prong of deliberate indifference. Are you able to point us to anything in the record that would demonstrate Hines' subjective intent related to deliberate indifference? Yes, Your Honor. In his pleadings, Mr. James alleged that on the first day of his would-be wound care appointment, Deputy Hines came to his door, yelled out his bed number, and while he got up to go to the bathroom and get dressed, Deputy Hines refused to wait for him and left him. And then, unbeknownst to Mr. James, Deputy Hines signed and filed a medical refusal form saying that he does not want to come to medical for wound care, which Mr. James disputes. And in fact, the district court found that Deputy Hines, who signed the medical refusal form, was involved in Mr. James' treatment by, quote, effectively impeding it. And this finding alone was enough to preclude dismissal as to Deputy Hines. But let's go back for a moment to the three elements that a plaintiff must allege facts to to state a claim under 1983. And as Your Honor mentioned, deliberate indifference is one of them, but others include a serious medical need and substantial harm. As to serious medical need, under this court's precedent, a serious medical need is one for which treatment has been recommended or prescribed, or for which the need for care is so apparent that even a layperson would recognize that it is necessary. Is that even at issue? Dr. Gore ordered wound care twice a week for Mr. James, and he didn't get it. I mean, isn't that pretty much conceded, that he had a serious medical need? Your Honor, the district court erroneously relied on Huff v. Thaler to say that Mr. James' condition was not sufficiently serious because it was not an emergency or life-threatening. And we argue that— Is that part of our precedent, that it must be life-threatening to be a serious medical need? No, Your Honor. It would contravene this court's precedent. And in fact, Huff was not a case that sought to articulate a novel requirement for a serious medical need. And therefore, the district court, again, erred by relying on that precedent, especially as it is an— Would you go blind if you don't have an ongoing eye infection and you don't get it treated? I mean, yes. Precisely, Your Honor. It is very close to the brain, and it could turn very serious very quickly. But to continue with substantial harm, substantial harm is satisfied when a delay in treatment causes unnecessary pain and suffering or exacerbates an inmate's medical problems. Importantly, a plaintiff does not need to allege to have suffered a permanent handicap, permanent loss, or any lasting complications resulting from the delay. Here, Mr. James alleged to have suffered great pain and worsening symptoms of infection as a result of the delay in receiving his medically prescribed wound care. This was enough for Mr. James to meet his burden at the pleading stage. But as to the three remaining defendants, the district court erred in denying Mr. James the opportunity to state a claim against them if one exists. And this is because it is the policy of this circuit to decide cases not on technicalities but on substantive rights. And this requires that a plaintiff be given every opportunity to cure a formal deficiency in their pleadings. As recently as this year, this court in Ricks v. Kahn held that dismissing an action after giving a pro se plaintiff only one opportunity to state a claim is ordinarily unjustified. Or as Judge Graves observed in Hernandez v. Texas Treasures, it is well settled that before dismissing a complaint, a plaintiff should be given an opportunity to amend his complaint and remedy any deficiencies. Is that what I said? Yes, Your Honor. That was a direct quote. Indeed, granting Mr. James an opportunity to amend would be in step with the overwhelming authority in sister circuits, including the 2nd, 3rd, 7th, 9th, and 11th, among others, that require that a pro se plaintiff be given an opportunity to amend before dismissal. Here, the district court wrongfully denied Mr. James that opportunity and in so doing deprived him of his day in court. We respectfully ask that this court reverse. And unless this court have any other questions, I reserve the balance of my time for rebuttal. Thank you very much. We appreciate your argument and you have saved time for a rebuttal. We'll now hear from Mr. Arsenault. Okay, that's not what our sheet says, but that's perfectly fine, so I'm just calling it in order on the sheet, but you go, Ms. Rito. That's fine. Madam Chief Judge and Senator Bookwort, Kathy Rito on behalf of the defendant's position. Keep your voice up, please.  Maybe move the mic up. Is this better? Yes. Okay. Coming off a cold, so I apologize. I'll discuss some of the procedural issues that the appellant raised first before we get into the substantive issues for the motion for summary judgment. It is the physician's position that Mr. James has been given fair opportunity to defend and prosecute these claims. He was given substantial chances and opportunities to correct his claims and his filings. He was given, the motion to dismiss was actually first granted by the defendants on November 23rd, 2022. There was then the motion to compel, which was brought up for discovery on December 23rd. It was granted by the defendants on November. I didn't understand that sentence. I apologize. It was referred, the motion to dismiss was referred to the magistrate judge on that date. So that's the date that Mr. James first had noticed that the defendant's position would be that there was no viable claim stated against them. He then filed the motion to compel discovery, which was just discussed on December 23rd, 2022. One important thing to note about that, your honors, is that discovery was propounded against the prison defendants. There's no discovery that was propounded to the physicians themselves or to my law firm. Therefore, there was no active discovery against us when these discovery issues were being alleged. Plaintiff didn't actually suggest that he would file and propound discovery against the defendant physicians until after the claim against them was already dismissed. So procedurally, the physicians were not obligated to participate in discovery in a case that they'd already been dismissed from. So I think it's important that that timeline be clarified as far as whether or not the prisoner actually had a right to pursue discovery against the physicians. He had it. We can assume he was aware that he could propound discovery against them because he did specifically propound discovery, focusing on Deputy Hines earlier on in the case. Counsel, you know, we were talking about some procedural technicalities, which may be important. I was wondering if your client ever consented to proceed before the magistrate judge. James and the St. Tammany defendants seemed to have consented. Did the doctor defendants ever consent to proceed, and is there any record of that in this file? Respectfully, Your Honor, I didn't see anything in the record. I didn't draft that filing or participate in it. Does that matter? If your client's never consented to proceed before the magistrate judge, does that matter? I think there's a de facto consent if they've proceeded all the way through and there's no objection to it. Okay. Well, I mean, I asked counsel the opposite about that because I had a concern about it. So you're saying you don't know whether they did or not, but there's a de facto consent? If they didn't, if everyone else consented and there was no formal objection to it, and then the magistrate judge then proceeded to issue orders and we didn't object to or challenge them, I would assume there was consent, Your Honor. All right. But in any event, we do believe that there was consent. Why didn't your client— I guess that just matters to me, but nobody else, so don't worry about it. Why? Okay. So the reason your clients didn't respond to the discovery request was what? It was never propounded to them. And there was a discussion about discovery that's raised in their briefs after the— Your clients never got any discovery request? No. And I believe that's brought up in our— Never? Not even untimely discovery request? I believe they may have been sent discovery after they were already dismissed from the claim. But it's my understanding from the record, and I believe it's cited in our briefs, that the discovery propounded was upon the jail defendants and not the physicians. Why wouldn't there be a genuine dispute of material fact as to deliberate indifference as to Mr. James' serious medical needs when Dr. Gore ordered wound care twice a week on June 1st, but from June 2nd to July 19th, he was not brought to medical one time? So I think the important thing, and it doesn't really get brought up in the appellate brief, Your Honor, is that that June 1st visit with Dr. Gore is a chronic care case. It's not something where Mr. James filed a request for medical services because he actually had an infection in his eye. If you look at— But he was ordered to have wound care, right, and he didn't get that care from June 2nd to July 19th, is that—and it's this same wound, isn't it? It's not a different part of his body or something, is it? So there's no actual evidence, Your Honor, of a wound at that point. Within the medical jail, wound care is anywhere where someone would go to get a bodily orifice cleaned. It doesn't mean that there is an active wound. Well, he ordered him to have this care twice a week. So the doctor thought there was something going on with him, that he ordered care for him twice a week, and he didn't get it. There's at least a fact issue that he didn't get it for more than a month. Why isn't that a fact issue on deliberate indifference to his serious medical need? So I think one thing we need to look at there, and I think one thing where these allegations against all the defendants get complicated is many of them are made globally. Dr. Gore only treated him on June 1st, and then later on June 21st, he issued an order for clindamycin, which we'll get to in a minute, but that June 1st, again, was a chronic care comprehensive order. He was issued to undergo multiple different types of treatment. He was issued to go to wound care to have the prosthetic eye cleaned, not because there was an infection, but just because that's routine care. Thereafter, the treatment was mainly overseen by the other physician, Dr. Hom. So to the extent that there's a 1983 violation, Mr. James himself even acknowledges that Dr. Gore wasn't part of the, quote, plot to erase and clean up the mistakes of alleged healthcare violations. You're saying routine care for a prosthetic eye is twice a week? That's for the physician to decide, and they modified it later to once a week. The physician said twice a week. Correct, Your Honor. That's not routine, is it? Maybe. I would submit that it is, because it's listed on the appellate record 506 to 511. Those whole pages are just routine care. He should get these. We should look at this for COPD. We should look at this for heart failure. He should get his eye looked at by wound care and have access to clean it in a sterile environment. You're saying he didn't find any problem? There's nothing in the record that says so, Your Honor. But regardless, his eye was not treated, and it exacerbated this infection. There's no ... And he filed three grievances complaining about his eye not being treated by June 20th, although the magistrate judge states that he had not filed any grievances until that date. So why isn't that a fact issue? The physicians get the request for care. They don't necessarily grievances in real time. I should ask your colleague this question. Like I said, this is a very amorphous case, Your Honor. A lot of the facts get crossed over. Can I ask your colleague the question about the fact that his medical records allegedly say he was given wound care in June, but the assistant warden checked the camera footage and confirmed that Mr. James was not taken to medical at all, so that the medical records are falsified? Should I ask, is that a question for him, or is that a question for you, that the medical records are false? The physician doesn't have access. Correct Health doesn't have access to ... To any medical records? Pardon? To the medical records being falsified. Is that on you, or is that on ... I don't mean you personally. Who is the person who would answer the question about that? I think the question there is, if we're articulating, I think this is one of the problems with a lot of the allegations that Mr. James brought up after the dismissal. On the initial complaint, he alleges specifically, again, he basically says Dr. Gore had nothing to do with the treatment. He was the initial doctor who put forth the chronic care orders. The real issue is the nexus of the claim against Dr. Hom, and he said that the initial complaint he had was that Dr. Hom failed to check the veracity of the medical refusal that the deputies submitted. We would submit first that it's not the physician's job to go into the jail's administration and say, was this properly done? But I will note that when Dr. Hom saw or heard about this complaint issue on June 20th, the day of the grievance was discussed with him, the next day the physicians ordered clindamycin, which is an antibiotic. So I think that evascerates the point that there is any deliberate indifference. Once Dr. Hom was made aware that the prisoner was saying that he had an eye issue and he was worried about infection, they prescribed, I think, a six-day dose of clindamycin, which is an appropriate treatment for an eye infection, even though, if you look at the records later, there was no clear evidence medically that there was an eye infection. Despite this, Correct Health and Dr. Hom, through their nurses, did in fact see the prisoner. They did, in fact, prescribe additional medication. One of Mr. James' biggest complaints is that on July 29th, he asked for topramycin eye drops so that he could self-administer as needed. So this sets up the point, too, that this isn't a one-off. If Mr. James routinely has eye complaints, this is something endemic to having a prosthetic eye. The Correct Health physicians were clearly monitoring him because when he did explicitly ask for medical treatment, the nurse said, I'll look into it. They didn't give him topramycin because they didn't think it was clinically warranted. But a few days later, on August 2nd, he was prescribed erythromycin and got the full course of that. And Mr. James can't have it both ways where certain records that are disfavorable to him are falsified. But then, on the other hand, he admittedly did receive treatment. Now, whether it was slightly untimely or anything to that extent, Your Honor, I think goes to the issue of medical negligence, which you brought up. And that is a very specific and distinct claim from a 1983 claim of deliberate indifference. We do disagree that there was a significant medical issue here. As Your Honor knows, not every claim for medical treatment or injury does rise to the level of the significant injury or claim to the inmate. A serious medical need is one for which treatment has been recommended, or the need is so apparent that a layman can see it. But why shouldn't there be some discovery? If there are allegations that the medical records, some of them are forged or done after the fact, or that they don't comport with actual treatment because the deputy says there's no going to medical, even though there's now records that say that he did go to medical, why isn't that cry out for some sort of actual discovery before summary judgment is granted? This is not a situation where we can say that we know exactly what treatment he did get and we say, oh, well, it may have fallen short, but it was some treatment, it was just a little bit, we don't even know because it's allegations that the treatment didn't take place and was covered up and faked after the fact and all of these, and I don't know, I mean, obviously those are allegations. Right. And, you know, Your Honor, the Fifth Circuit is clear, and Lempar and Olivier, which both parties briefed, speculation and probable inferences and associated assertions don't adequately provide specific facts to overcome summary judgment. He hasn't had a chance to do his discovery yet to overcome the summary judgment. He didn't even make those allegations of falsified medical records, Your Honor, until after the dismissal was issued. You know, it's sort of like he moved the ball. He said that they didn't, that Dr. Holland didn't specifically work up the claims that Deputy Hines falsified the request for medical services. Correct Health Physicians then showed, well, you got medical treatment anyway. You were prescribed appropriate medication for this alleged eye infection, which the nurses didn't actually think that you had clear need for. There was no real injury here, except for a few weeks of alleged pain, which anyone would get with any eye infection anyway. Okay. Can you just clarify once for me, I'm unclear, about the over a month and a half where he didn't get his eye taken care of? In June, Your Honor. June to mid-July. Is that, is your position that that's not serious medical need? Or is your position that he did actually get care? Or is your position that it's negligence, not deliberate indifference? What is the argument that you're making on that point? First off, we disagree with that. If you look at from June to July, on June 2nd, the medical record shows he was in the wound care clinic to wash his eye. There were no issues there. So you believe actually he did get care during that time? Correct. We stand by the medical records that were in there. Admittedly, there are weeks where he didn't get treatment, whether it's because he refused treatment or anything else from the position of the physicians is really irrelevant, because when they found out about the grievance on June 20th, the next day he's prescribed antibiotics to address this alleged mistreatment. They responded immediately, which I think undermines the whole deliberate indifference standard. To the extent that there's a medical negligence claim, that might be colorable, however, it was never argued. It was never pled. Okay. So he did get care. Correct. Is this response to that? You're saying on June 20th? Correct. On June 20th was the day Dr. Hahn was alerted to the alleged grievance. On June 21st to June 28th, he received an entire course of clindamycin, which is something that one would be prescribed for an alleged eye infection. What about June 1st to June 20th? I mean, admittedly, Your Honor, there's nothing in the records there, but our argument there, and has been acknowledged by the Fifth Circuit, is that medical negligence does not rise to  And the fact that he received treatment on June 20th is on dispute? I believe that's when, per their own records, Mr. James spoke with Dr. Hahn about the grievance, and that's when he said he didn't know about it, or that he allegedly did not follow up properly on it. But the point of summary judgment, simply, Your Honor, is that there's no deliberate indifference here, because as the physicians were alerted to these issues, they were prescribing medication for him within 24 hours. And they had no duty to make sure he got the wound care from June 2nd to June 20th? Again, Your Honor, we Did the doctors have a duty to make sure he gets that treatment? I would argue, no, because if he's not brought to the clinic, it's not The wound care clinic is a sterile environment where they can clean wounds, they can clean, again, bodily orifices. It's not something that you can bring into a prison cell or a common area. So I think that would put an impossible standard on physicians to always have to leave the clinic and go and hunt down every inmate that they may be treating or have an active order for, which would be virtually every inmate in a facility, and ensure they get their care. I think that would be an impossible standard. So that's Mr. Arsenault's problem? The transport of patients to the clinic?  That would be on his side of the house? I believe so, Your Honor. Okay. Let's get him up here. Good morning, Your Honors. Nothing like being wanted. As you know, I'm James Arsenault, and I represent the St. Tammany defendants in this case. It seems from Your Honor's questions that the claims against Sheriff Smith, Warden Fleischman, Assistant Warden Simmons are not being pursued on appeal. So I'm going to confine my argument to the claims against Deputy Hines. Before I get into some facts in this case, which I think are going to clear things up, I want to key in on your question, Your Honor, about the deliberate intent of the deputy in this case. So what we're here talking about is the deputy, and what we're talking about is a relatively small period of time when the deputy goes to the jail to retrieve inmate James. There's a case, Easter v. Powell, and I looked at this when you asked this question, because I think it answers the question. When you asked opposing counsel about this, about the subjective awareness, it says that deliberate indifference requires a showing that the official was subjectively aware of the risk of serious harm to the inmate. He must know of and disregard an excessive risk to inmate health or safety. And as I know this Court is aware, that case involved a patient with a heart condition. The medical provider at the jail was aware of it. There were medications that were prescribed. The doctor or the nurse there chose not to give the person their medications. They knew treatment was there, and they didn't give it to him. I think that's very, very different from the case at Barr. And my point there is that if you look at the complaint and the allegations made against Deputy Hines, those allegations aren't there. They do not allege that Deputy Hines knew that the plaintiff had a serious medical condition and disregarded it. Do you not have a pussy eye that's very obvious every time he sees him? I'm glad you asked that, Your Honor. What we're dealing with here is a very small window. As you know, initially the plaintiff alleges this happened on June 1st. Of course, he goes to jail medical that day, June 1st, and the following day, June 2nd. The plaintiff restates it and says this happened on June 7th. So that's the day we're going to go with. One thing I wanted to describe is when this happens, when these jail pickups happen, there's a pod deputy in the middle of the dorm where all the inmates are, and they have the buttons and the intercoms. So when jail inmates get picked up for jail medical, they call out over the intercom, hey, the transport deputy is coming to do jail appointments. Inmates Powell, Smith, and Johnson, bed numbers, whatever, be ready, he's coming. They're given about ten minutes' warning. The transport deputy arrives, and he comes in, and there's just a gate, people can hear him, and he announces, inmate James, inmate Smith, inmate Johnson, bed numbers, whatever, I'm here to pick you up to go to jail medical, so come on up. I point that out to say that these inmates are aware that they're getting picked up to go to jail medical. The allegation in this case against Deputy Hines is that when he admittedly came to pick up Mr. James, which is admitted throughout everything, he came to come get him, James says he refused to let me go to the bathroom and wash my face. So I'm trying to figure out exactly how that works. Did he ask him, can I go wash my face? Because if he chose to go wash his face instead of go with Deputy Hines, as the other inmates did, that's his choice that he didn't go. So to me, if he's choosing not to go, that's the reason he doesn't go, and that's the reason there's that delay. What part of that story is evidence that he chose not to go? What if I want to wash my face and go? Well, Your Honor, that's why I pointed out that they have noticed. If you say, I understand you're here, could I have a minute to wash my face? You're not saying he didn't do that, you're not saying he did. You're saying he went to wash his face. So the deputy, who knew he was washing his face? Excellent questions all. All right. If you look at the allegations, it's not there. All he says is, I chose to go wash my face. He doesn't say, I asked the deputy if I could wash my face and he said yes or no. He just says, I chose to do it. I went to go wash my face and he left me. And my point of that is, if I'm at home and I need to go to the doctor and I need a ride because of a medical condition and the doorbell rings, I'm not just going to leave, ignore the doorbell, and go to the bathroom and come back and hope he's still waiting for me. If I want to wash my face before I'm going to go, I'm going to answer the door and say, hey, can I wash my face before we go or do we not have time? And if he says we don't have time, I'm going without washing my face. Are you saying that's what the deputy did? I'm saying the petition says that the deputy called him to come. But I'm saying we don't know what the deputy did, so why don't we do some discovery? Your Honor, if you look at the complaint, the petition admits the deputy called him out. That's what he says in the petition. But if he called me out and I said, can I have a moment to wash my face, we don't know what happened. All you know is he wasn't taken and he washed his face. We don't know what else happened. You can go ahead. You and I are not going to get anywhere with this. Well, I'm not trying to be obstinate, Your Honor. I'm just saying what the petition says and what all of their appellate pleadings say is that he went to go wash his face. He didn't allege I asked if I could go wash my face. It just said I went to go wash my face. So I'm just reading strictly from the petition. He called me to come get me. I went and washed. He refused to let me wash my face. Well, if he refused to let you wash your face, why didn't you just go with him? That's my question. So, in any event. Can I ask a couple questions?  Is it your position that Deputy Hines' alleged falsification of a medical refusal form and failure to take him to get the medical treatment is just mere oversight by the medical team? It seemed to say that in the brief. And I'm not sure that that's what you meant to say. As far as falsification goes, Your Honor, the medical refusal form at issue has Deputy Hines' signature on it. And if you look at the very bottom of that form, there's a box where he signs it. And it indicates that the inmate refused to sign it. So obviously this happens. It only has Deputy Hines' signature on it. So he is alleging, as you pointed out, Judge Graves, earlier, that he didn't get it and he didn't sign it. All right? Even if that's the case, I would say that that is an error or an omission, and it doesn't rise to the level of deliberate indifference. He was suspended for the refusal form issue, wasn't he? That's an allegation that was made. I actually don't know the answer. I mean, we might want to know that. Was he suspended for falsifying a form? Your Honor, that's an allegation that was made by the pro se plaintiff. I don't know the answer to that question. Discovery might be helpful. On that issue, it could be helpful, Your Honor. What's your best case against a finding of deliberate indifference or at least a fact issue on deliberate indifference as to Deputy Hines specifically? If we look at the requirements of deliberate indifference, there are four prongs that have been pointed out by the court. So you have failure to treat, ignoring complaints, intentionally treating incorrectly, and similar conduct that would clearly evince a wanton disregard for a serious medical need. With my clients not being health care providers, the first three don't apply. So we're talking about number four, clearly evincing a wanton, so a reckless, malicious, cruel disregard for serious medical needs. I don't think that's here. And for that to be found, that period of time we talked about before where the jail deputy comes and calls names and that inmate doesn't come, I don't think that rises to the level of clearly evincing a wanton disregard for serious medical needs. But it's not just a one-day thing, is it? It's over a period of a whole month and a half or something. Your Honor, we are limited to this June 7th date when he claims the deputy came to get him and he didn't go. Are we? Because your friend on your side says that y'all are responsible for making sure that he gets to the medical wound center. And so somebody's responsible for making sure. It's not Deputy Hines' job to take him to the medical wound center the twice a week pursuant to the medical order that everybody acknowledges exists? Your Honor, it is Deputy Hines' job to take anybody who has jail medical appointments to jail medical. But if an inmate refuses to go, then he doesn't take them. But that's only on one day that we know about a refusal. But we know that there's lots of days that he wasn't taken. Well, Your Honor, there's nothing in the petition that indicates that he was taken or scheduled to be taken other days and he wasn't taken. As my counsel pointed out, as you noted, when we find out about this claim that he wasn't going to jail medical, we get the records from jail medical who indicated, no, he did go on these dates. It was later determined that those weren't dates that he actually went to jail medical, but those were dates that a nurse from jail medical came to the pod and gave him medication, including these antibiotics. So this is why the warden didn't? I thought he needed to be in some kind of wound unit that's so clean and pure and he couldn't get medication in his cell. I can't speak to that. Isn't that what we heard? That the wound care is supposed to be done at this place and so they're not going to the cells? I thought we just heard that. And now you're telling me that the nurse actually went to the cell and that's why it's not on the video when the assistant warden reviewed the video? The nurse went to the cell to provide medication, not to provide wound care. And, again, my answer to your underlying question is that if he refuses to go, there's nothing else we can do. He actually added into the record other refusal of treatment forms that he signed. One was for some issue with a tooth and another one was for a COVID vaccination, and he refused treatment for both of those. The other thing that I would point out, Your Honor, as far as deliberate indifference, outside of the fact that he has to clearly demonstrate a wanton disregard for a serious medical need, is he also has to show substantial harm. In a case like this with delay for deliberate indifference, he has to show substantial harm. As my colleague pointed out, when he goes to jail medical on 7-19-22, there are no complaints of eye pain or discomfort. Same on 7-22, same on 7-25. So any delay in going to jail medical from June 7th to July 19th, for whatever reason, doesn't appear to give rise to substantial harm because on July 19th, 22nd, and 25th, he has no complaints or discomfort in his eye. But what about the pain in between the time? Is that not actionable? Well, Your Honor, I'm glad you asked that. The case that they rely on for that that indicates that the pain in time and alleged potential for infection, I believe, is the Alderson case. And the Alderson case, if you'll permit me, is the one that is very, very distinguishable from this case. That's a case where there was a fight in prison and an inmate got beaten up very badly, broken ribs, punctured wounds to his head, face, and neck. In that case, and this brings me back around to something you asked earlier, those wounds were so obvious that a layman could see it. When you have punctured wounds in your face and neck, that's something you can see. Further distinguishing the Alderson case, that's the one where after being beaten up, which the jail personnel knew about because it was a fight at jail, that prisoner was prescribed antibiotics and pain medication. And in that case, a jail official told the plaintiff when he asked for his medications to man up and wait until the medical staff returns from the Christmas holiday. That, to me, I understand how that's deliberate indifference. That's a wanton disregard for a serious medical need. And going back to what you said before, it was the Gobert case that ironically is a case that opposing counsel brought up. That's a case that when they discuss serious medical need, they discuss this language that's also in Gobert about so obvious a layman could understand it. And I want to answer your question before about the eye. So what we're dealing with here is a prosthetic eye, and the inmate wants to go and wash it with soap and water to be sure the eye socket behind the eye doesn't get dirty or infected. I think that differentiates this from a case where someone has puncture wounds in their face and neck. If you have a prosthetic eye and behind it it's dirty, I can't see it because your eyeball is in the way. So I don't think this is at all obvious to a layman in the way that it was in Gobert, in Albertson. You had another case where there was a fixator screwed into a plaintiff's bone with an open wound. That was open and obvious. I don't believe this one is, Your Honor. And going back to your question before, I really do think what's missing in this case, outside of clearly evincing a wanton disregard for a serious medical need, is this intent prong. And you brought that up before when you asked opposing counsel that question. They have to establish that the deputy possessed a culpable state of mind. And there's nowhere where they established the security personnel defendants knew of a serious risk to his health but ignored that risk. They don't allege we had subjective knowledge of an alleged worsening condition or substantial risk of serious harm and intentionally disregarded it. So I believe your question to opposing counsel was very germane, and I think that's fatal to their claim. Did your client get served discovery? Yes, and we answered it. And you answered it. So I should have asked your friend why the discovery wasn't answered when the dismissal order didn't get entered until July of 2023 because there's a time period which the order's been circulated but it's not been entered, and it seems like the discovery should have been in your client answered it. My client answered and answered timely. That's correct. As a matter of fact, the plaintiff in pleadings admitted that the issue of not getting discovery for my clients was moot. It's admitted in pleadings. So, yeah, we answered the discovery, Your Honor. Thank you. Great. Thank you very much. Okay, Ms. Howells, you've saved time for rebuttal. You have two minutes. Thank you, Your Honors. I just want to start off by kind of highlighting the fact that there's been a lot of finger-pointing today. We have the doctors who say that it was Hines' fault. We have Hines who says that it was James' fault. Clearly, it's somebody's fault, and perhaps we don't know what the correct answer to that question was, but that just really drives home the fact that discovery was needed in this case, and summary judgment should not have been entered so prematurely. I also just want to clarify that, again, as you mentioned, the doctor-defendant's discovery obligations did not expire when the magistrate judge issued the report and recommendation. It was not until July when that report and recommendation was affirmed. And then there were just a lot of fact disputes, again, that remain in this case, and some of which were even raised today that, again, should preclude summary judgment. As for the treatment that opposing counsel mentioned on June 21st, the day after the grievance was filed, there's a fact dispute as to whether that treatment was ordered for his eye infection or perhaps something else. Mr. James alleged in his original complaint that that treatment was ordered for what he and the nurse assumed to be a mouth infection, and on that record, that June 21st record, it does not say whether that treatment is ordered for his eye or otherwise. So there is a fact dispute regarding what that treatment was ordered for and if it had anything to do with his eye. What did he say about, well, his no harm, no foul, that he's fine in July and has no problems with his eye? Well, there were several medical records between July 19th, that first appointment, through the end of September, that show that he was ordered three additional treatments, a new round of wound care, and two different antibiotics, which raises a fact dispute about whether his infection was exacerbated to the point that it became resistant to his original treatment, maybe. And there's just several medical records that show that he complained about symptoms and things of that nature. So there are fact disputes there because of that. Thank you. We have your argument. Thank you, Your Honor. We'll hear from Ms. Badillo-Gazzart-Garcia now. Your Honors, two points on rebuttal. On deliberate indifference, while I appreciate the explanation provided by Mr. Arsenault, these are all fact issues outside of the pleadings, and they were not argued either by the defendants, either side of defendants, either in the proceedings below or in their briefing. And it's important to highlight that Deputy Hines signed and filed a medical refusal form that explicitly said that Mr. James does not want to come to medical, and the validity of that form was disputed by Mr. James at the outset. This is more than negligence or more than accidental oversight. And importantly, this court has found deliberate indifference in cases where inmates allege that prison officials denied recommended treatment. And yes, deliberate indifference is more than negligence, but it is less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will occur. Second, a common thread in the arguments of both defendants is that Mr. James's condition was not serious. He didn't suffer harm, no harm, no foul. And the range of harm suffered by 1983 plaintiffs can be seen as a spectrum. At one end, a plaintiff ultimately succumbs to their injuries and dies or suffers permanent handicap, and at the other, a plaintiff is made to suffer pain that no one would suggest serves any penological interest, or a plaintiff's condition worsens as a result of the delay. Yes, both ends vary in their degree of severity, but both can constitute a cognizable Eighth Amendment violation under 1983. Importantly, this court in Ford v. Anderson County said that an inmate does not need to be experiencing an acute medical crisis requiring medical intervention to be facing a substantial risk of harm. And to the extent that this court finds that Mr. James's original pro se complaint does not allege subjective intent as to Deputy Hines or any of the other St. Tammany defendants, he should have been given the opportunity to amend for dismissal with prejudice. And unless the court has any more questions, we ask that this court reverse. Thank you. We have your argument. We appreciate the argument on appointed counsel and the student attorneys on the behalf, and we appreciate the arguments for Mr. Smith et al. and Dr. Ham deHalm et al. by Mr. Arsenault and Ms. Rito as well. Thank you for all the arguments. The case is submitted, and this concludes this sitting of the court, and the court will stand adjourned pursuant to the usual order. Thank you.